

# NUMBER 13-23-00340-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

### IN THE MATTER OF THE MARRIAGE OF
### TAMARA LYNN FRAKER AND CHRISTOPHER SCHUBERT
### AND IN THE INTEREST OF D.R.S., A CHILD

### ON APPEAL FROM THE COUNTY COURT AT LAW
### OF KERR COUNTY, TEXAS[1]

## MEMORANDUM OPINION

### Before Justices Silva, Peña, and Cron
### Memorandum Opinion by Justice Cron

At the conclusion of a bench trial in a suit affecting the parent-child relationship,

the trial court appointed appellant Tamara Lynn Fraker (Mother) and appellee Christopher

---

[1] This case is before the Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. We are bound by the precedent of the transferring court to the extent that it differs from our own. *See* TEX. R. APP. P. 41.3.

Schubert (Father) as joint managing conservators of their child, D.R.S., granted Father the exclusive right to designate the child's primary residence, and awarded Mother a standard possession order. By a single, multifarious issue, Mother challenges the trial court's discretionary decision to grant Father the exclusive right to designate the primary residence of their child.[2] She initially complains that the trial court abused its discretion by appointing Father as a joint managing conservator in the first instance because the record contains credible evidence that Father engaged in a history of family violence against Mother prior to their separation.[3] Building on this premise, Mother argues that the trial court misapplied the law by failing to consider, among other things, whether Father overcame the rebuttable presumption that it was not in the child's best interest for Father to designate the child's primary residence.

Alternatively, Mother contends that the evidence was legally insufficient to support the trial court's decision to grant Father primary custody because: (1) the trial court abused its discretion by admitting a custody evaluator's testimony and report recommending Father as the primary conservator; and (2) the evaluator's opinions amounted to no evidence because they lacked "a reliable factual and foundational basis." According to Mother, the trial court gave considerable weight to the custody evaluator's unreliable opinions, and this likely caused the rendition of an improper judgment.

Finally, Mother argues that even if she loses on the arguments above, she should

---

[2] Mother also challenges derivative rights assigned to Father as the primary conservator, such as the right to receive child support.

[3] We granted Mother leave to file a supplemental brief in which she raised this additional argument in support of her overall challenge to the primary residence designation. For organizational purposes, we have elected to address it first.

still have the exclusive "right to consent to medical, dental, and surgical treatment involving invasive procedures, to consent to psychiatric and psychological treatment, and to make decisions concerning the child's education" because she was "D.R.S.'s primary caretaker during the first 5 years of his life."

We conclude that Mother waived any complaint about Father being appointed as joint managing conservator and even invited the purported error by expressly asking the trial court to appoint both parties as joint managing conservators. We also hold that Mother failed to preserve the arguments she makes on appeal about the admissibility of the evaluator's opinions. We additionally hold that, even if some of her factual underpinnings were flawed, the evaluator's ultimate opinion about primary custody was not incompetent, and the record otherwise supports the trial court's judgment. Finally, we hold that the record supports the trial court's decision to grant both parties independent parental rights. Accordingly, we affirm the trial court's judgment.

## I. BACKGROUND

The parties married on September 9, 2016, and D.R.S., the only child of the marriage, was born in February of 2017. The parties separated on February 4, 2018, after Mother made an allegation of family violence. Mother filed for divorce on February 20, 2018, and Father filed a counter-petition seven days later.

### A. Father's Possession and Access During Suit

Other than a period of temporary reconciliation, Mother was the child's primary caregiver throughout the duration of the suit, which, for various reasons, remained pending in the trial court for nearly five years. Father's possession and access to the child

3

generally expanded over the life of the case:

- At the outset, Mother denied Father any access to the child for approximately six weeks.

- In April of 2018, the parties agreed to temporary orders that granted Father two hours of supervised visitation each Saturday.

- Shortly after their agreement, the parties temporarily reconciled and Father had unlimited possession of, and access to, the child during this period.

- In August 2019, the parties agreed to modified temporary orders that granted Father possession and access to the child for five hours every Saturday at one of several public locations. Mother or her designee were allowed to be present at the location but could not directly supervise or interfere with the visitation.

- In December of 2019, after a contested hearing, the trial court modified the temporary orders by granting Father unsupervised possession and access every Saturday from 9:00 a.m. until 6:00 p.m. Father was also granted electronic communication with the child every Wednesday from 6:30 p.m. until 7:00 p.m. The parties were also ordered to share "all significant information concerning the health, education, and welfare of [D.R.S.]"

- In June of 2021, the parties agreed that Father would have possession of the child every other weekend, standard possession during holidays, and extended possession during the summer of 2022.

## B. Court-Appointed Custody Evaluator

In December 2019, the trial court granted Father's motion to appoint a child

custody evaluator. Charlotte Taber, licensed as both a professional counselor and a marriage and family therapist, was ordered to prepare a written report in accordance with § 107.113 of the family code. Among many other instructions, the trial court ordered Taber to provide her "findings, opinions, recommendations, and answers . . . to the following questions: Should the parties be appointed as joint managing conservators of the child? What periods of possession of and access to the child should be ordered for each party?" The trial court also instructed Taber to consider things like, "Which party is best able to meet the emotional needs of the child?"

Taber provided the parties with a copy of her written report in October of 2021. Taber concluded that both parties "are good parents" who love D.R.S. "very much" and that it was in the child's best interest "to have both of them in his life." However, Taber expressed concerns that Mother was attempting to alienate the child from Father. She cited evidence that Mother was "degrading [Father] in front of her son." Taber found "that [Mother] does not support a strong relationship between [Father] and their son." She also observed that "[Mother] seems convinced that she is the sole decision maker in what relationship [Father] will have with their son." Taber recommended that the parties be appointed joint managing conservators, "with extended visitation awarded to [Father]." But she also explained that her recommendation was constrained by her understanding that "[t]his particular evaluation is not to determine which parent should designate the residence of the child," noting that Father "is seeking standard visitation."

Two days after the parties received the report, Father amended his petition by seeking primary conservatorship of D.R.S. Six months later, in April of 2022, Father filed

a "Motion for Child Custody Evaluation Update," explaining that the parties were unable "to settle the child related matters in mediation" and that "[b]y the time this matter reaches trial, it will have been more than 6 months since the custody evaluator had contact with the parties." The trial court granted the motion in May of 2022, finding "that an update to the child custody evaluation, prior to trial, is appropriate and is in the best interest of the child." The trial court also found that "the parties agree[d] to an update to the child custody evaluation." Unlike the extensive "Order for Child Custody Evaluation," the "Order for Child Custody Evaluation Update" merely ordered Taber to perform "an update to the child custody evaluation."

In her updated report, Taber again recommended joint managing conservatorship, but this time with Father as the primary conservator and Mother with extended possession and access. She said she did not address the right to designate the primary residence in the initial report because it was not expressly requested in the appointment order and because it was her understanding that the issue "was a settled Court matter." Otherwise, she "would have recommended that [Father] should designate the residence of the child" in the initial evaluation. Taber reported that her "concerns about [Mother] that existed a year ago . . . have continued to develop in ways that are not in the best interest of [the child]." For example, Taber found that Mother "continues to attempt to dictate every aspect of how [Father] communicates, spends time and parents their child."

Taber reiterated her opinion from the original report that Father "is highly credible" and "continues to exhibit good parenting skills." She also found that the child "is highly connected to [Father]" and that the child "has expressed a desire to spend more time with

6

him."

Taber acknowledged that "[c]hanging primary custody is a difficult decision and one that is not taken lightly" because it has the "the potential to disrupt the stability and security of the child." She noted that Mother "is highly involved in her son's life, education and extracurricular activities." She also noted that Mother has the child enrolled in a highly ranked school and "that the quality of schools carries more weight in custody evaluations when all things are somewhat equal." However, Taber expressed her belief "that things are not equal in this case." In her opinion, "it would be in the best interest of [the child] to live primarily with his father in order to give him the ability to avoid traumatic contention from his parents and continue to thrive."

During her testimony at trial, Taber explained that, over the course of her twenty-year career, she has been ordered to perform custody evaluation updates in the past, especially when the information in the initial report had become stale. Her primary concern in performing an update is to determine if anything has changed with the parties. In some of those cases, she reformed her recommendations in the update because a party's circumstances had materially changed. In this case, though, she "found that things were pretty much still the same." The concerns she expressed about Mother in her initial report remained.

## C. Trial Court's Rulings

After hearing from several witnesses and admitting numerous exhibits, the trial court took the matter under advisement. On April 11, 2023, the trial court signed a final divorce decree that appointed the parties as joint managing conservators, granted Father

the exclusive right to designate the primary residence of the child, and granted Mother standard possession of the child.

At Mother's request, the trial court entered extensive findings of fact and conclusions of law, including findings that Mother engaged in behavior intended to discourage a relationship between Father and D.R.S., that Mother took affirmative steps to keep D.R.S. from having meaningful contact with Father, that Mother engaged in erratic and abusive communication toward Father, and that Mother had consistently failed to inform Father about D.R.S.'s medical appointments and extracurricular activities. The trial court also found that, to varying degrees, all the *Holley* factors, as well as other factors, supported its conclusion that it was in child's best interest for Father to designate his primary residence and for Mother to have a standard possession order. No post-trial motions were filed. Mother timely perfected her right to appeal.

## II.    STANDARD OF REVIEW

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002. When appointing joint managing conservators, the trial court is required to designate the conservator who has the exclusive right to determine the child's primary residence. *Id.* § 153.134(b)(1). "[C]onservatorship determinations are 'intensely fact driven.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002)). Accordingly, "the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'" *Id.*

8

(quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *Id.* "With regard to issues of custody, control, possession, child support, and visitation, we give the trial court wide latitude and will reverse the trial court's order only if it appears from the record as a whole that the trial court abused its discretion." *Garza v. Garza*, 217 S.W.3d 538, 551 (Tex. App.—San Antonio 2006, no pet.).

Generally, a trial court abuses its discretion when it acts arbitrarily or unreasonably, or without any reference to guiding rules and principles. *In re K.L.C.*, 672 S.W.3d 734, 743 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.). A trial court's findings of fact are subject to the same legal and factual sufficiency standards as jury verdicts. *Tex. Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). When a case is tried to the bench, a party may raise a legal or factual sufficiency challenge for the first time on appeal. TEX. R. APP. P. 33.1(d).

However, the traditional sufficiency standards of review overlap with the abuse of discretion standard in family law cases. *Garza*, 217 S.W.3d at 549. As a result, a legal sufficiency challenge is not an independent ground of reversible error. *Id.* Instead, it constitutes a factor relevant to our assessment of whether the trial court abused its discretion. *Id.* Thus, in considering whether the trial court abused its discretion because the evidence is legally insufficient, we apply a two-prong test: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Id.* A trial court does not abuse its discretion if there is

9

some evidence of a substantive and probative character to support the decision. *In re K.L.C.*, 672 S.W.3d at 743.

In determining whether there is legally sufficient evidence to support a finding, we examine the record in the light most favorable to the finding, credit evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable fact finder could not. *Hinkle v. Hinkle*, 223 S.W.3d 773, 778 (Tex. App.—Dallas 2007, no pet.). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.* In conducting our review, we are mindful that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* We may not substitute our judgment for that of the factfinder's, even if we would reach a different answer on the evidence. *Id.*

Likewise, we review a trial court's decision concerning the admissibility of evidence, including whether expert testimony is reliable, for an abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). "But a party may assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict." *Id.* Even if a trial court errs in admitting evidence, we will reverse the judgment only if the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a). In applying this standard, we consider "the role the evidence played in the context of the trial." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). When erroneously admitted evidence "was crucial to a key issue, the error was likely harmful." *Id.* On the other hand, the erroneous admission of evidence that is merely cumulative of

10

properly admitted evidence is generally harmless. *Jackson v. Takara*, 675 S.W.3d 1, 7 (Tex. 2023).

### III.  JOINT MANAGING CONSERVATORS

Mother first complains that the trial court abused its discretion by appointing Father as joint managing conservator because the record contains credible evidence that Father engaged in a pattern of family violence against Mother prior to their separation.[4] *See* TEX. FAM. CODE ANN. § 153.004(b) (providing that a trial court "may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past . . . physical . . . abuse by one parent directed against the other parent"). She points, for example, to several admissions Father made to Taber, including that, prior to the parties' separation, he punched holes in a wall, threw food at a restaurant, and intentionally broke Pyrex on the floor. Father largely admitted to these incidents at trial but denied that any of those actions were directed at Mother. Although the trial court specifically found an absence of family violence, Mother contends that the record conclusively establishes the opposite. This mistake, according to Mother, had a cascading effect because the trial court failed to apply the statutory presumption that it was not in the child's best interest to designate Father as the primary conservator. *See id.* As a threshold matter, we conclude that Mother waived this issue and even invited the purported error. *See In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) (observing that "error preservation in the trial court . . . is a threshold to appellate review").

---

[4] We note that there were also allegations that Mother committed family violence against Father. For example, Taber interviewed a witness who reported "that he has seen [Mother] slap and punch [Father] in the face and chest on at least six occasions." Ultimately, the trial court did not make a finding of family violence against either party.

11

Generally, to preserve error, a party must present to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. TEX. R. APP. P. 33.1(a)(1). Further, the party must obtain an express or implicit adverse ruling or object to the trial court's refusal to rule. *Id.* R. 33.1(a)(2). Likewise, under Rule 103 of the Texas Rules of Evidence, error may not be predicated upon a ruling which admits or excludes evidence unless a timely objection or motion to strike appears on the record, stating the specific ground of objection, if the specific ground was not apparent from the context. TEX. R. EVID. 103(a)(1). Finally, "a party cannot complain on appeal that the trial court took a specific action that the complaining party requested, a doctrine commonly referred to as 'the invited error' doctrine." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (quoting *Ne. Tex. Motor Lines v. Hodges*, 158 S.W.2d 487, 488 (Tex. 1942)).

When Mother filed her original and only petition for divorce in February of 2018, she alleged that it was in the child's best interest that she "be appointed sole managing conservator." She expressed the same view to Taber during the initial evaluation. However, by the time this case was finally tried in December of 2022, Mother had changed her position. During her testimony, Mother confirmed that "joint managing conservatorship is the kind of conservatorship that should be awarded in this case." At the conclusion of trial, the court asked each party to file a summary of the relief they were requesting. Mother's filing reaffirmed her position that "[t]he parties should be appointed parent joint managing conservators." Mother did not argue during trial, or in any post-trial motion, that Father was prohibited from being appointed as a joint managing conservator under

12

§ 153.004(b).

Consequently, Mother has not preserved this issue for our review. *See Martinez v. Martinez*, 157 S.W.3d 467, 471 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (concluding that appellant failed to preserve issue of whether joint managing conservatorship conflicted with § 153.004 because "[n]o mention of any of the provisions in [§] 153.004 was made by either party in the court below"); *see also In re Marriage of Roberson*, No. 05-07-01061-CV, 2008 WL 4868345, at *1–2 (Tex. App.—Dallas Nov. 12, 2008, no pet.) (mem. op.) (same). Moreover, having requested the very relief in the trial court that she now complains about on appeal, Mother is estopped from raising this issue under the doctrine of invited error. *See Tittizer*, 171 S.W.3d at 862; *see also In re A.S.Z.*, No. 02-07-00259-CV, 2008 WL 3540251, at *2 (Tex. App.—Fort Worth August 14, 2008, no pet.) (per curiam) (mem. op.) (holding that father could not complain on appeal about trial court's conservatorship decision because father "agreed to these provisions at trial"). Mother's first argument is overruled.

## IV.    EXCLUSIVE RIGHT TO DESIGNATE PRIMARY RESIDENCE

Mother next complains that, even if joint conservatorship was appropriate, the trial court abused its discretion by selecting Father over Mother as the primary conservator. *See* TEX. FAM. CODE ANN. § 153.134(b)(1). She focuses her fire on Taber's evaluation, first arguing that the trial court abused its discretion by admitting her testimony and updated report because: (1) Taber exceeded the scope of the trial court's order; and (2) Taber failed to perform the basic elements of an evaluation while conducting her update. She next argues that, even if those arguments were not preserved, Taber's

opinions were legally insufficient, and therefore, the record does not support the trial court's decision.

## A.     Applicable Law

The general purpose of a custody evaluation is to gather relevant information concerning issues of conservatorship and possession and make a recommendation to the trial court regarding the best interest of the child. *See* TEX. FAM. CODE ANN. § 107.101(1). "A person may not offer an expert opinion or recommendation relating to the conservatorship of or possession of or access to a child at issue in a suit unless the person has conducted a child custody evaluation" as provided for in the family code. *Id.* § 104.008(a). In that regard, the custody evaluator must perform "each basic element of a child custody evaluation as specified" in the family code "unless the failure to complete an element is satisfactorily explained." *Id.* § 107.109(a). These basic elements include personally interviewing the parties; interviewing the subject child during a party's period of possession if the child is at least four years of age; observing the child, regardless of age, in the presence of each party; obtaining relevant information from collateral sources, including school records, mental health records from each party, records from the Texas Department of Family and Protective Services, and criminal history information relating to the parties or any person living with a party; and assessing the relationship between the child and the parties. *Id.* § 107.109(c). To omit one of these basic elements from the evaluation, the evaluator is required to identify the missing element in the report, explain why the element was not completed, and explain the effect of the missing element on the evaluator's opinion. Admission of a custody evaluation at trial "is subject to the rules of

14

evidence." *Id.* § 107.114(a).

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. In general, the opinions of expert witnesses are not binding on the factfinder even when they are uncontroverted. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338 (Tex. 1998). "If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997); *see* TEX. R. EVID. 705(c). Stated differently, opinion evidence is not probative "if it lacks a factual basis or is made in reliance on a basis that does not support the opinion." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 717 (Tex. 2016). "Expert testimony is [also] unreliable 'if there is too great an analytical gap between the data on which the expert relies and the opinion offered.'" *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015) (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (Tex. 2004)). "Regardless of the manner in which we determine reliability, we do not decide whether the expert's opinions are correct; rather, we determine whether the analysis used to form those opinions is reliable." *Id.*

In some cases, expert testimony is necessary to support a judgment because the subject matter is outside the common understanding and experience of the factfinder. *See, e.g.*, *id.* at 348 ("We have consistently required expert testimony and objective proof

15

to support a jury finding that a product defect caused the plaintiff's condition." (collecting cases)). This is not one of those cases. Trial courts are routinely called upon to make conservatorship determinations without the aid of expert testimony. In other words, the circumstances that influence best-interest determinations are within the common understanding and experience of trial courts. *See id.* ("Proof other than expert testimony will support a jury finding only when the jurors' common understanding and experience will allow them to make that finding with reasonable probability."); *Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied) ("Wife testified that, in her opinion, the kind of overnight visits prohibited by the injunction were not in the best interest of the child; Husband disagreed. The trial court was charged with making the decision based upon that testimony, but also upon his experience with and understanding of the individuals involved and their circumstances.").

## B. Statutory Admissibility Arguments Not Preserved

Mother contends that the trial court should have excluded Taber's testimony and updated report recommending Father as the primary conservator because that question was not specifically identified in the appointment order and because Taber did not perform all the basic elements of an evaluation when she conducted her update.[5] *See* TEX. FAM. CODE ANN. §§ 107.103(c)(5) (providing that the appointment order must include "the specific issues or questions to be addressed in the evaluation"), 107.109(c) (listing basic elements of an evaluation). These arguments do not match Mother's trial objections, and

---

[5] Mother does not complain that Taber's original report, which was also unfavorable to Mother, suffered from the same deficiencies. Instead, Mother contends that an updated report must conform to every basic element of an evaluation under the family code, whereas Taber treated the update as a mere supplement to her original report.

consequently, we do not reach them. *See Watts v. Watts*, 396 S.W.3d 19, 23 (Tex. App.—San Antonio 2012, no pet.) ("In order to preserve error for appellate review, a party's argument on appeal must comport with its argument in the trial court." (collecting cases)).

Mother claims that she first "objected to Taber's updated report" during her opening statement. Not so. Knowing that Taber's recommendations would be unfavorable to her, Mother merely previewed her argument for why the trial court should discount Taber's evaluation:

> I'm going to tell the Court that I do not intend to sponsor in any way the testimony, the work, or the results and recommendations of Charlotte Taber, except to say one thing. There were two evaluations done in this case. An early one in October of 2021, where we believe the evidence is going to show Charlotte Taber recommended that [Mother] is going to be the primary caretaker, and that [Father] was going to have expanded visitation schedule.
>
> An updated report was ordered by this Court in spring of 2022. We believe as a result of—well, stated another way, we believe that this report has some deficiencies and inadequacies that justif[y] the Court in dismissing it as to its findings and recommendations. And we intend to show the Court the reasons that that should be done. So we're going to ask the Court to pay special attention not only to the testimony of each of these parties, but primarily the testimony of Charlotte Taber.

Asking the trial court as a factfinder to "pay special attention" to an expert's testimony because you "intend to show" the "deficiencies and inadequacies" in the expert's report is not tantamount to asking the trial court to perform the judicial function of ruling on the admissibility of the report, especially in the context of an opening statement. Even if it was, Mother's vague allusion to the report's "deficiencies and inadequacies" did not alert the trial court to the specific statutory grounds she raises on appeal. *See* TEX. R. EVID. 103(a)(1); TEX. R. APP. P. 33.1(a)(1)(A). Moreover, Mother did not obtain a ruling or object

17

to the lack of a ruling. *See* TEX. R. APP. P. 33.1(a)(2).

Later, when Father called Taber and offered her as an expert, Mother made the following objection:

[COUNSEL]:      I'm going to object to her being tendered as an expert. I don't believe that she's shown to be credentialed sufficiently to be accepted as an expert at this time.

THE COURT:      Is there something specific you're looking for, [counsel]?

. . . .

[COUNSEL]:      No. I'm—I don't want to be in a position of educating [Father's] [c]ounsel. But my objection is that she doesn't reach the standard, based on what an expert is supposed to be in this particular case to be accepted as an expert by the Court. So I'm going to object at this time.

THE COURT:      Okay. Court's going to overrule the objection.

Whether a person is qualified to perform a custody evaluation, and therefore render an expert opinion, is a discrete question under the family code. For example, the person must have "at least a master's degree from an accredited college or university in a human services field of study and a license to practice in this state as a social worker, professional counselor, marriage and family therapist, or psychologist." TEX. FAM. CODE ANN. § 107.104(b)(1). The person must also have certain practical experience or perform the evaluation under the direct supervision of a qualified evaluator. [6] *Id.* § 107.104(b)(1)(A)–(B), (2). Mother's trial objection that Taber was not properly

---

[6] We note that Taber testified that she has a qualifying master's degree, two qualifying licenses, had trained under a qualified custody evaluator, is an approved custody evaluator in Bexar County, and had been performing custody evaluations for twenty years.

18

"credentialed" as an expert "in this particular case" does not comport with the arguments she raises on appeal. *See Watts*, 396 S.W.3d at 23.

Finally, when Father offered the updated report into evidence, Mother objected to the report "based on a lack of authentication." That objection was also overruled, and the updated report was admitted into evidence.

In sum, Mother forfeited the statutory arguments she now raises for the first time on appeal regarding the admissibility of Taber's testimony and updated report. *See id.* Her second argument is overruled.

## C.    Taber's Opinions were Not Incompetent

Mother argues in the alternative that the record was legally insufficient to support the trial court's decision because "[t]he underlying data, facts, and assumptions Taber relied on were unsound and thus her opinion lacked probativeness." Mother takes particular exception to Taber's conclusion in her updated report that Mother "lied about domestic violence and attained temporary primary custody under false pretenses," which Taber believed was detrimental to D.R.S. because he was unnecessarily separated from Father during his toddler years. Mother contends that this conclusion was fundamentally flawed, not only because the record supported a finding of family violence, but also because the record reflects that Father initially agreed to different forms of limited visitation. Mother notes that their separation was precipitated by her allegation of family violence, and she contends that Father's willingness to agree to limited visitation afterwards revealed a guilty conscience. Mother argues that this erroneous conclusion that Mother "lied about domestic violence" infected Taber's entire evaluation and caused

Taber to unfairly fault Mother for certain conduct that Father was equally guilty of. Mother also argues that some of her behavior that Taber found concerning should have been excused because it was consistent with someone who had been a victim of domestic violence.

Even if we assume that some of Taber's concerns were unfounded, Taber had many other concerns about Mother's behavior that shaped her ultimate opinion, and some of those concerns were based on undisputed facts. For instance, Taber reviewed text and email exchanges between the parties where Mother used her control over Father's limited access to D.R.S. as both a carrot and a stick to extract concessions from Father or punish him for perceived slights. Notably, Mother voluntarily provided these exchanges to Taber, and they were admitted into evidence at trial. It was also undisputed that, in an attempt to manipulate Father into reconciliation, Mother engaged in self-harm while D.R.S. was in her care. Taber cited these as examples of Mother "putting her own needs over that of her son and using her son to gain control in reconciling her relationship with [Father]." We fail to see any "analytical gap" between these undisputed facts and Taber's conclusion. *See Gharda USA*, 464 S.W.3d at 349. In any event, the trial court was free to draw its own conclusions from these undisputed facts, *see Uniroyal Goodrich*, 977 S.W.2d at 338, and we are required to view the evidence in the light most favorable to the trial court's judgment. *See Hinkle*, 223 S.W.3d at 778.

Taber also raised concerns that Mother tried to dictate Father's parenting style and cited several examples of this behavior. Taber explained that "it is imperative that [Mother] allow [Father] to parent his way" because "[p]arents who are divorced co-parent better

20

when they respect the abilities of each parent." Finally, and perhaps most importantly, Taber believed that Mother had engaged in a pattern of alienating behavior. Among other examples, this behavior included Mother's admission that she told D.R.S. that Father did not love him when the child was a toddler, Mother talking down to Father in front of D.R.S., and Mother instructing D.R.S. to refer to Father as "Chris dad" after she became romantically involved with another man. Poisoning a child's mind against a parent is not in the child's best interest. *See Allen v. Allen*, 475 S.W.3d 453, 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("[P]ersistent alienation of the other parent can be a guiding consideration in making possession and access determinations."); *In re Marriage of Chandler*, 914 S.W.2d 252, 254 (Tex. App.—Amarillo 1996, no writ) (explaining that "changes which may injuriously affect the child's best interest" include "poisoning the child's mind against a parent"). Therefore, Taber's recommendation cannot be distilled down to her conclusion that Mother "lied about domestic violence." It was also based on other well-documented concerns, as well as her positive evaluation of Father's parenting skills and the child's expressed desire to spend more time with Father.

In considering each parent's prior involvement in the child's life, the trial court found:

> The custody evaluations admitted into evidence and the testimony elicited at trial establish that [Mother] has made significant and persistent efforts to minimize [Father's] role in the child's life. The history of this conduct by Mother indicates that the conduct will likely persist, as it was happening as recent[ly] as the time of the child custody evaluation update, and would likely prevent [the child] from having a meaningful relationship with [Father].

We conclude that this finding is supported by legally sufficient evidence. Based on this finding, we also hold that the trial court did not abuse its discretion because there is some

21

evidence of a substantive and probative character to support the trial court's decision to designate Father as the primary conservator. *See In re K.L.C.*, 672 S.W.3d at 743. In truth, the record is replete with other evidence, when viewed in the proper light, that also supports the trial court's judgment. We have only highlighted the quantum of evidence necessary to the disposition of this appeal. *See* TEX. R. APP. P. 47.1. Mother's third argument is overruled.

## V.    INDEPENDENT RIGHTS

Finally, Mother submits that, irrespective of how we resolve her arguments above, she should have the exclusive "right to consent to medical, dental, and surgical treatment involving invasive procedures, to consent to psychiatric and psychological treatment, and to make decisions concerning the child's education." The trial court granted both parents the independent right to make these decisions. *See* TEX. FAM. CODE ANN. § 153.134(b)(4) (providing that, when appointing joint managing conservators, the trial court shall "allocate between the parents, independently, jointly, or exclusively, all of the remaining rights and duties of a parent as provided by Chapter 151"). According to Mother, there is legally insufficient evidence to support the trial court's decision to grant these independent rights to Father because "it is undisputed that [Father] was not D.R.S.'s primary caretaker during the first 5 years of his life."

Mother's argument is indicative of Taber's concern that Mother "continues to attempt to dictate every aspect of how [Father] . . . parents their child." The trial court shared this concern, specifically finding that "[t]he history of this case details an irreconcilable parental relationship laden with [Mother's] anger and skepticism of [Father]

22

despite [Father's] desire to have a co-parenting relationship[.] [T]he parties appear unable to communicate to reach shared decisions about [D.R.S.]." This finding is supported by the record, and therefore, the trial court did not abuse its discretion by granting independent rights to each parent. Mother's final argument is overruled.

## VI.    CONCLUSION

Based on our review and consideration of the entire trial record, we conclude that the evidence is of sufficient and probative character to uphold the trial court's decision to designate Father as the conservator with the exclusive right to designate the primary residence of the child. We affirm the trial court's judgment.

JENNY CRON
Justice

Delivered and filed on the
24th day of July, 2025.

23